[Civ. No. 976.   Third Appellate District.—October 22, 1912.]

## JOSEPH BREIDENBACH and NELLIE BREIDENBACH, Appellants, v. M. McCORMICK COMPANY and ANDREW McCORMICK, Respondents.

APPEAL FROM JUDGMENT—DISMISSAL—LIMITED REVIEW—ORDER DENYING NEW TRIAL.—Where an appeal was taken both from the judgment, and from an order denying a new trial, and it appears that the appeal from the judgment was taken more than six months after its entry—that appeal may be dismissed; and the review must be limited to the appeal from the order.

NEGLIGENCE—RUNNING AWAY OF UNATTENDED HORSE AND WAGON—PRESUMPTION—PRIMA FACIE CASE.—Where an unattended horse and wagon runs away in the streets of a city, and in its course injures a person who is riding in a carriage, who is without fault, a *prima facie* case of negligence on the part of the owner of the runaway horse and wagon is shown. When that which causes the injury is under the management of the defendants, and the accident is such as in the ordinary course of things would not happen, if those who have the management use proper care, there is a presumption of negligence, in the absence of explanation by the defendants.

ID.—ERROR IN GRANTING NONSUIT.—It was error to grant a nonsuit in such case, at the close of the plaintiff's evidence, on the ground that there was no evidence tending to show the negligence of the defendants, it being admitted that the defendants were the owners and possessors of the runaway horse and wagon, and it being proved that there was no driver on the runaway team, and that it struck the buggy in which the plaintiff was riding, to her serious injury, it being shown that the hitching rope was not dragging, but was tied up on the hames.

ID.—GROUNDS OF NONSUIT—REVIEW UPON APPEAL.—The reviewing court is not at liberty to consider any ground of nonsuit, which was not stated in the motion therefor; and where the sole ground stated in the motion was "that no negligence whatever has been proven against the defendants," no other ground of nonsuit can be considered.

APPEAL from a judgment of the Superior Court of San Joaquin County and from an order denying a motion for a new trial. Frank H. Smith, Judge.

The facts are stated in the opinion of the court.

Webster, Webster & Blewett, for Appellants.

Clary & Louttit, for Respondents.

CHIPMAN, P. J.—Plaintiffs alleged in their complaint: That, on the thirteenth day of September, 1909, plaintiff, Nellie Breidenbach, was driving along the streets of the city of Stockton in a carriage drawn by one horse; that defendants were then the owners of a horse and wagon which were in the control and possession of defendants. "That the said horse belonging to the defendants was an unruly, fractious and vicious horse and well known to the defendants to be such an unruly, fractious and vicious horse. That the defendants carelessly and negligently left said horse and wagon without a driver upon the public highway of the said city of Stockton, and that by reason of said carelessness and negligence on the part of the defendants, the said horse then being attached to the said wagon, ran away and struck the carriage in which the plaintiff, Nellie Breidenbach, was driving along the highway and overthrew the same and threw the plaintiff, Nellie Breidenbach, out of the carriage upon the ground, whereby the plaintiff, Nellie Breidenbach, was bruised, wounded and lacerated and was for about fifteen days confined to her bed and is still suffering as a result of said bruising, wounding and lacerating, to the damage of plaintiffs in the sum one thousand dollars."

Defendants, in their answer, admit ownership of the horse and wagon and that they were in the possession and control of their employee, O'Dell, at the times mentioned in the

complaint. But they deny each and all the material averments of the complaint imputing negligence.

The cause was tried by the court sitting without a jury and at the conclusion of plaintiffs' evidence the court granted defendants' motion for a nonsuit on the ground stated in the motion, to wit, "that no negligence whatever has been proven against the defendants." A motion for a new trial was denied and defendants had judgment. Plaintiffs appeal from the judgment and order denying their motion for a new trial.

The judgment was entered on April 1, 1911, and notice of appeal was served and filed on March 1, 1912. The appeal from the judgment having been taken more than six months after entry of judgment, may be dismissed. (*Brownlee* v. *Reiner,* 147 Cal. 641, [82 Pac. 324]; *Sheakley* v. *Nelson,* 13 Cal. App. 379, [109 Pac. 891]; Code Civ. Proc., sec. 939.) The only points available to appellants are that there was sufficient evidence on the question of defendants' negligence to go to the jury; that it was error to grant the nonsuit, and that errors of law were committed in the rulings of the court in the omission or rejection of evidence which would warrant a reversal of the order refusing to grant a new trial.

The evidence on which appellants rely as tending to show negligence of defendants is found in the testimony of the plaintiff, Mrs. Breidenbach, and witness Charles Turner. As there is not much of it we will set out all that is found in the record. Mrs. Breidenbach was riding in a buggy with her mother along Center Street, in Stockton. She testified: "A. Near the center of Center Street, and there was several buggies tied to the right of the street, and naturally I had to turn out of their way, and I don't know, I saw—there was some collision in the street; I saw Mr. Turner waving his hands, and several people screaming, but I did not just understand what they was saying, and I said there was something wrong, speaking to mother; she looked back and at the same time I glanced back and I said 'My goodness,' there was a runaway coming behind us; right behind us, and we were to our right, and my idea was—I told mother just be careful, don't touch the lines— . . . Q. Just go ahead and tell what happened, Mrs. Breidenbach. A. As I said, I told mother to leave me alone; and I thought I could get out of the way of

it, but I had to be very careful on account of the car tracks, not overturn our buggy. And I thought I could get out and beat the horse. But the next thing I realized was I saw that black mare alongside of us. I saw my mother thrown into the street. I did not think I was going to be thrown out at the time. I did not realize what was happening. In the next minutes I was lying in the street. . . . Q. Now, at that time, or when you looked back at this runaway, did you see whether or not there was a driver on the wagon? A. There was no driver on the wagon. I am positive of that.''

Witness Turner also testified to this latter fact. He testified that he was working in defendants' stable at the time, was familiar with their horses and had helped hitch them up and of this particular horse he said he had ''hitched it up lots of times.'' He was asked to tell what he saw of the accident and answered: ''I was washing the wagon; I saw the horse; I came to the front of the door, on the east side; that is, in front of the barn on the east side; I looked down and saw the horse coming from Weber Avenue; I seen the horse coming running; that was about I guess three or four hundred feet down, and Mrs. Breidenbach and her mother . . . were driving in front of the barber shop across the street; this was about 150 yards coming to them on the full tilt; I hollered to them 'Drive on'; ran out on the street and hollered to them 'Drive on.' '' He testified that, shortly after seeing Mrs. Breidenbach, the wagon drawn by the running horse struck her buggy and she and her mother were thrown out. Witness followed up the running horse to the point not far away where ''they caught her down there, and I went and got her; I led her—she was out of the harness almost. . . . Q. When you got her did she have a halter on? A. No, she didn't have a halter. When I used to send the horse out I most generally always sent one of these little ropes with her, to tie with. Sometimes it was in the wagon and sometimes it was on her neck. Q. When you found her that day did she have a halter? A. Had a little rope around its neck and I led her back. Q. Was that rope complete? A. The rope was tied up on the hames. Q. It was not dragging, or anything of that kind? A. No, sir, nothing but the lines dragging, that is all I seen was dragging. . . . Q. Were

you acquainted with the character of that horse, the kind of horse it was? A. Well, it was a mare not all the time liable to be trusted, I will say that.'' He was asked again to tell what kind of a horse that was. A. ''Well, she was a mare that sometimes you could go in the stall with her, sometimes you could not, just according to how she felt or anything; she was liable to pull back on you sometimes, or anything else. Q. I will ask you whether or not you know of your own knowledge whether that horse had ever run away before this particular runaway? A. Not before this particular runaway, I don't think so.'' He was asked if she ran away after that but his answer was not responsive to the question and was stricken out.

From the testimony, and we have stated all that had any immediate or remote bearing upon the question of negligence, plaintiffs present the matter in the following concrete form: ''The conditions governing the case at bar are that the horse and wagon belonging to the defendant was running away unattended and the hitching strap was not loose and dragging, but was fast to the hames. Such was the testimony of the witness Turner. Everything, therefore, indicated negligence on the part of the defendants or their employee, and we maintain the burden was thrown upon the defendants to show that the horse was attended or was properly secured, or that his running away was wholly without fault of the defendants or their employee.''

Just what significance should be attached to the fact that the hitching strap was not dragging when the horse was found but was made fast to the harness, is not easy to determine. The inference appellants would draw is that the condition of the hitching strap indicated that the horse was not tied or secured in any way by it when the horse ran away or the hitching strap would have been dragging, which in the latter case might indicate that the horse had been tied and had broken loose. However, the point particularly relied on is—that when a horse runs away unattended in the streets of a city and in its course injures a person without his fault, a *prima facie* case of negligence on the part of the owner of the horse is shown. An examination of the authorities and our own conception of what the law ought to be,

convince us that appellants' position is the correct one and that the court erred in granting the nonsuit.

The responsibility of the owner of a horse for an injury committed by it begins at the moment the owner takes the horse from its stall. He is presumed to know how he handled the horse, what he did with it and when and how it escaped from him, if it runs away. These are facts not within the knowledge of the injured person who first sees the horse as it is about to run over him. It may be that the only witness to the cause of the runaway was the owner or driver. The horse may have started because left unhitched; or it may have taken fright from some defect in hitching it to the wagon, or from the wagon itself, or from some part of the harness giving way, or from some object at the roadside, or from careless driving, or from some other of the numerous causes of runaways. It would be an exceptional case of a runaway in which the driver or owner could not explain the cause. But the plaintiff ought not to be put to the risk of resting his recovery upon the testimony of the guilty party. The rule laid down in *Judson v. Giant Powder Co.,* 107 Cal. 556, [48 Am. St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1021], was as follows: ''When a thing which causes the injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use the proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from the want of care.''

Defendants admit ownership and possession of the horse on the day of the accident; they admit that the horse was in the custody and control of their servant, O'Dell. O'Dell's deposition was taken by plaintiffs and offered in evidence but, on objection of defendants, the court, properly, we think, denied its admission. It was admitted, however, that the deposition was regularly taken before a notary public and transcribed by the stenographer but, before it had been read over and signed by the witness, he committed suicide. The deposition is not included in the bill of exceptions. If any inference could be indulged from this circumstance it would be that probably the witness who could explain the cause of the runaway had made an explanation unfavorable to defend-

ants, and hence the objection to its admission. We are not permitted to speculate as to the purport of this deposition. But this untoward event lends some support to the view we entertain that, in such case as this, the plaintiffs should not be forced to prove that the runaway was caused in its inception by defendants.

Recurring to the rule in the Giant Powder Company case, we have here a horse and wagon that were concededly under the "management" of the defendants' driver. (We do not understand that this management must be shown to have existed at the moment of the accident.) The accident was "such as in the ordinary course of things does not happen if those who have the management use the proper care." (Horses do not in the ordinary course of things run away; if they did their use would have to be prohibited.) It seems to us the rule alluded to should apply here.

It was held by the supreme court, in *Rowe* v. *Such*, 134 Cal. 573, [66 Pac. 862, 67 Pac. 760], that the rule in the Giant Powder Company case did not apply to the facts in the Rowe case. In that case, which is relied upon by appellants, the horse was not unattended; the driver was on the wagon at the time the horse started to run and he was thrown off the wagon. There was no evidence showing fault of the driver. All the facts were before the jury and there was nothing shown from which negligence could be imputed to the driver. Hence the rule had no application. But whether this particular rule should apply or not, we think that, under the circumstances here appearing, there was sufficient evidence of negligence to call for an explanation by the defendants and that the court erred in granting the motion for nonsuit.

Let us turn for a moment to what the courts have said. The decisions are generally to the effect that the running away of horses where no driver is present creates a *prima facie* case of negligence on the part of the owner. Where, however, a horse runs away with his driver, it has been held that there is nothing in that fact itself to show negligence on the part of the driver. (29 Cyc. 595.)

Generally, negligence will not be presumed from the mere fact that a horse ran away, unless the horse was unattended. (6 Thompson on Negligence, sec. 7665.) We do not consider those cases where the horse is attended by his driver although we find that they are sometimes inappropriately referred to

as sustaining a view contrary to that we have taken.    It must be remembered, too, that in some states negligence is a question solely with the jury and the court is not permitted to say that certain facts constituted negligence *prima facie* and thus remove the case from the jury.    This is the rule in Connecticut and cases from that jurisdiction, such as *Button* v. *Frink*, 51 Conn. 342, cited in *Rowe* v. *Such*, 134 Cal. 573, [66 Pac. 862, 67 Pac. 760], relied on by respondents, and *O'Brien* v. *Miller*, 60 Conn. 214, [25 Am. St. Rep. 320, 22 Atl. 544], cannot be used to support the position taken by defendants.

In *Garsuch* v. *Swan*, 109 Tenn. 36 [97 Am. St. Rep. 836, 69 S. W. 1113], it was held that when a team is "found running away, unattended, upon a public thoroughfare, and doing hurt to one lawfully thereon, negligence is *prima facie* imputable to the owner from this fact alone."

In *Gannon* v. *Wilson*, 1 Sadler (Pa.), 422, [5 Atl. 381], the charge of the trial court was approved that, "when a horse and wagon are found running along, without a driver, upon the sidewalk of a public street, and injury to another person or his goods is caused by it, it is *prima facie* evidence of negligence on the part of the owner."    The court held that it is the duty of the owner of a horse not voluntarily to permit it to run on the sidewalk of a public street, and, when so found, the owner must rebut the presumption of negligence arising therefrom.

It was held, in *Crawford* v. *Upper*, 16 Ont. App. Rep. 440, that the fact that a horse runs away in a city street and does injury shows a *prima facie* case of negligence which calls for explanation on the part of the defendant owner, and a nonsuit was held erroneous.

In *Unger* v. *Forty-second St. Ferry*, 51 N. Y. 497, a team of horses became detached from one of the defendant's cars and ran away, injuring the plaintiff.    No proof was offered to show how the horses became detached from the car, or as to the cause.    The court said this was sufficient to make out a *prima facie* case, and the fact that the horses were unattended and unfastened in the street was, unexplained, evidence of negligence against the defendant, and hence no error was committed in refusing to nonsuit the plaintiff at the close of the evidence.

*Hummell* v. *Wester*, Brightly (Pa.), 133, was similar to *Gannon* v. *Wilson*, 1 Sadler (Pa.), 422, [5 Atl. 381], and it was held that the law presumes negligence on the part of the

owner of a horse attached to a wagon or carriage, found running away on a city sidewalk, and it lies upon the owner to show that there was no fault on his part.

In the case of *Watson* v. *Weekes,* Queen's Bench, 1887, Smith, J., it was held, as stated in *Tolhausen* v. *Davies,* 59 L. T. N. S. 436, that upon proof that defendant's horse harnessed to a cart, unattended, running along a highway, whereby the plaintiff, being lawfully thereon, was injured, a judge could not rightly nonsuit, for such facts were more consistent with the absence of ordinary care in the superintending a horse, than with such care having been used.

*Snee* v. *Durkie,* 6 F. (Ct. of Sess.), 42 (England), cited in 1 Butterworth's Digest, 67, held that a presumption (though a rebuttable one) of negligence arises if a runaway horse and carriage knock a person down in a public street.

The fact that a team of runaway horses was found dashing along a public highway, without attendance of the owner or his servants, was held, in *Kokoll* v. *Brohm & B. L. Co.* (77 N. J. L. 169, [71 Atl. 120], to raise a presumption of negligence in their management and care which will render the owner liable, in the absence of explanation, for injuries caused by their unrestrained acts.    Followed in *Francois* v. *Hanff,* 77 N. J. L. 364, [71 Atl. 1128.]

In *Pearl* v. *McAulay,* 6 App. Div. 70, [39 N. Y. Supp. 472], the court said: "This is an action to recover for personal injuries.    The plaintiff, while crossing a street in the city of Brooklyn, was knocked down and run over by the defendant's horse and wagon; at the time of the accident the horse and wagon was unattended by any person.    On proof of those facts the plaintiff presented a *prima facie* case of negligence on the part of the defendant.    (*Unger* v. *Forty-Second St. R. R. Co.,* 51 N. Y. 497; *Doherty* v. *Sweetser,* 82 Hun, 556, [31 N. Y. Supp. 649].)    The defendant therefore was called upon to explain how it was that the horse was running at large without fault on his part."

In a Louisiana case it was held that—"The fact that a team is found running away upon the streets of a city without a driver requires explanation as to how and why this should have been, and if the driver is not produced as a witness, or his absence accounted for, it is fair to presume that no satisfactory explanation could have been given." (*Maus* v. *Broderick,* 51 La. Ann. 1153, [25 South. 977].)

There would seem to be a peculiar hardship in the present case to deny the plaintiff the benefit of this rule for she endeavored to show by the driver himself what the explanation was and was deprived of his testimony, on objection of defendants, by the suicide of the witness before he had the opportunity to read his deposition and sign it. The plaintiff, in our opinion, was not called upon to make any explanation of the cause of the running away but that this duty devolved upon defendants. (See, also, *Howley* v. *Kraemer*, 36 Misc. Rep. 190, [73 N. Y. Supp. 142] ; *Kelly* v. *Adelmann*, 72 App. Div. 590, [76 N. Y. Supp. 574] ; *Manzoni* v. *Douglas*, L. R. 6 Q. B. Div. 145.)

It is freely admitted that, on the principal question discussed, there are cases holding squarely to the rule contended for by respondents. But the weight of authority is clearly the other way and if it were not we should still adhere to the views herein expressed.

Respondents call attention to the complaint and claim that there was no evidence of any kind that they had "left said horse and wagon unsecured and without a driver upon the public highway in the city of Stockton" or "that the defendants carelessly and negligently left said horse and wagon unsecured and without a driver upon the public highway," etc. It is said the proof is at variance with the pleadings and hence the court was justified in granting the nonsuit. The only ground for the motion for nonsuit was—"that no negligence whatsoever has been proven against the defendants." We have endeavored to show that plaintiffs made out a *prima facie* case of negligence. The motion was not on the ground of variance between the proofs and pleadings. The reviewing court is not at liberty to consider any ground which was not stated in the motion. (*Shain* v. *Forbes*, 82 Cal. 576, 583, [23 Pac. 198].)

The judgment and order are reversed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 20, 1912.